UNITED STATES DISTRCT COURT
EASTERN DISTRCT OF MISSOURI
EASTERN DIVISION

**FILED**
SEP - 8 2021
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **4:21CR00500 SRC/NCC** |
| v. ) | |
| ) | |
| ) | |
| RONALD SCOTT MILLER, ) | |
| ) | |
| Defendant. ) | |

### INDICTMENT

The Grand Jury charges that:

### COUNTS ONE–FOUR
### (Wire Fraud: 18 U.S.C. § 1343)

I.  **Introduction**

At all times material to this Indictment, unless otherwise specified below:

1.  S.F.C. was a small business located in St. Louis County, Missouri, within the Eastern District of Missouri. S.F.C.'s business involved selling and installing floor coverings. To install floor coverings for their commercial and residential customers, S.F.C. at times employed between 35 and 45 installers. S.F.C. also employed personnel to manage the offices.

2.  Defendant **RONALD SCOTT MILLER** was employed by S.F.C. as the Warehouse and Labor Supervisor. As the Warehouse and Labor Supervisor at S.F.C., Defendant's responsibilities included directly supervising S.F.C.'s installers, scheduling weekly shifts for S.F.C.'s installers, and drafting weekly timesheets for S.F.C.'s installers. Defendant also had the authority to hire flooring installers.

1

3.  For each week, Defendant would draft a timesheet for S.F.C.'s installers, and Defendant would include in that weekly timesheet precisely how many hours each installer worked during each day.

4.  As the Warehouse and Labor Supervisor at S.F.C., Defendant also had the authority to purchase any items that were necessary to complete S.F.C.'s floor covering installation projects. When Defendant purchased items that were necessary to complete S.F.C.'s floor covering installation projects, he would either pay for the items and seek reimbursement from S.F.C., or Defendant would use S.F.C.'s company-owned Chase credit cards. Defendant only had authorization to use S.F.C.'s company-owned Chase credit cards to purchase items that were necessary to complete S.F.C.'s floor covering installation projects.

5.  Defendant received an annual salary from S.F.C., and he was not authorized to receive bonus or commission payments.

## II. The Scheme to Defraud

6.  Beginning by at least on or about March 27, 2014, and continuing through at least on or about September 29, 2020, in the Eastern District of Missouri, and elsewhere, the defendant, **RONALD SCOTT MILLER**, with the intent to defraud, devised and intended to devise a scheme and artifice to defraud S.F.C. and to obtain money and property from the S.F.C. by means of material false and fraudulent pretenses, representations, and promises, as described further herein.

### A. Defendant Fraudulently Drafted and Submitted False Weekly Timesheets Reflecting Work That Employees Did Not Perform.

7.  It was part of the scheme and artifice to defraud that Defendant fraudulently and falsely listed on numerous weekly timesheets that Defendant, his partner (G.C.), and his son (B.M.) performed work that they did not, in fact, perform. After Defendant drafted the fraudulent weekly

2

timesheets reflecting work that was not performed, Defendant provided those fraudulent weekly timesheets to another S.F.C. employee, who then sent the fraudulent information included in the weekly timesheets to a payroll processor via interstate wire transmission. After S.F.C.'s payroll processor received the fraudulent information included in the weekly timesheets, the payroll processor either provided S.F.C. with physical employee paychecks, or the payroll processor facilitated direct deposits of payments into S.F.C.'s employees' bank accounts.

       **i.**       **Defendant Fraudulently Represented that G.C. Worked as a Flooring Installer for S.F.C. When G.C. Never Actually Worked for S.F.C.**

8. It was part of the scheme and artifice to defraud that Defendant fraudulently and falsely listed on weekly timesheets that his partner, G.C., worked for S.F.C. as an installer. On numerous weekly timesheets, Defendant wrote G.C.'s name, indicating that G.C. worked as an installer for S.F.C., and Defendant also listed the number of hours that G.C. purportedly worked per week—all without G.C.'s knowledge or permission. In truth and fact, G.C. never worked for S.F.C. in any capacity.

9. It was further part of the scheme and artifice to defraud that, after S.F.C. received employee paychecks back from its payroll processor, Defendant collected G.C.'s paychecks from S.F.C.'s main office. After collecting G.C.'s paychecks, Defendant forged G.C.'s signature on the paychecks' endorsement lines, and then Defendant deposited the paychecks made out to G.C. into Defendant's personal bank account with Scott Credit Union (account number ending in 0643). Defendant took all of these actions without authorization from S.F.C. and without G.C.'s knowledge or permission. In total, Defendant defrauded S.F.C. out of at least $74,214.49 as part of his fraudulent use of G.C. as a phantom employee.

### ii. Defendant Fraudulently Drafted and Submitted Weekly Timesheets Reflecting Work That B.M. Did Not Perform.

10. It was further part of the scheme and artifice to defraud that Defendant falsified the nature and scope of his son's (B.M.) work at S.F.C. On numerous weekly timesheets, Defendant fraudulently and falsely inflated the hours worked by B.M., and—at times—Defendant completely fabricated the hours that B.M. worked during a pay period. For those fraudulent weekly timesheets where Defendant represented that B.M. performed work that B.M. did not perform, Defendant listed the number of hours that B.M. purportedly worked per week—all without B.M.'s knowledge or permission. In truth and fact, B.M. did not perform all of the work reflected in Defendant's fraudulent weekly timesheets.

11. It was further part of the scheme and artifice to defraud that S.F.C.'s payroll processor facilitated direct deposit payments based on Defendant's fraudulent weekly timesheet submissions. When S.F.C.'s payroll processor facilitated direct deposit payments based on Defendant's fraudulent weekly timesheet submissions, S.F.C.'s funds were initially deposited into B.M.'s personal bank account with Scott Credit Union (account number ending in 4573) until on or about July 25, 2019. After funds from S.F.C. were transferred into B.M.'s personal bank account with Scott Credit Union (account number ending in 4573), Defendant would often transfer the majority of those funds into his personal bank account with Scott Credit Union (account number ending in 0643). Around on or about July 25, 2019, Defendant requested that B.M.'s earnings be deposited into Defendant's personal bank account with Scott Credit Union (account number ending in 0643). Thereafter, from on or about August 1, 2019, until on or about September 10, 2020, Defendant's personal bank account with Scott Credit Union (account number ending in

0643) received the direct deposit payments based on Defendant's fraudulent weekly timesheet submissions.

### iii. Defendant Fraudulently Drafted and Submitted Weekly Timesheets Reflecting Work That He Did Not Perform.

12. It was further part of the scheme and artifice to defraud that Defendant fraudulently and falsely listed on numerous weekly timesheets that he performed work at flooring installation projects that he did not, in fact, perform. After S.F.C.'s payroll processor received the false information on Defendant's fraudulent timesheets, the payroll processor then facilitated direct deposit payments into Defendant's personal bank account with Scott Credit Union (account number ending in 0643).

### B. Defendant Submitted Fraudulent Invoices and Altered Receipts So That S.F.C. Would Pay Him Money That He Was Not Entitled to Receive.

13. It was further part of the scheme and artifice to defraud that Defendant submitted fraudulent invoices to S.F.C. purportedly for necessary flooring supply or repair purchases that he made from companies named Mid-West Diamond (a/k/a Mid-West Diamond Tool) and Cameran Tool Service (a/k/a Cameran Services, Cameron Services). In truth and fact, Mid-West Diamond and Cameran Tool Service were fictitious companies created by Defendant. Indeed, the addresses listed on those fraudulent invoices did not belong to any company. For both fictitious companies (Mid-West Diamond and Cameran Tool Service), Defendant created accounts with Square, Inc., both of which were linked to Defendant's personal bank account with Scott Credit Union (account number ending in 0643). After creating the Square, Inc. accounts for Mid-West Diamond and Cameran Tool Service, Defendant regularly used S.F.C.'s company-owned Chase credit cards to send payments to the Square Inc. accounts that he created for Mid-West Diamond and Cameran

5

Tool Service. To justify the payments from S.F.C.'s company-owned Chase credit cards to the Square Inc. accounts for Defendant's fictitious companies, Defendant would submit fraudulent invoices purportedly from the companies. In addition to using S.F.C.'s company-owned Chase credit cards to send payments to his fictitious companies' Square Inc. accounts, Defendant also sought reimbursements from S.F.C. for purchases that he purportedly made from Mid-West Diamond and Cameran Tool Service. In response to Defendant's requests for reimbursement, S.F.C. would write Defendant checks for the amounts that Defendant purportedly paid to Mid-West Diamond and Cameran Tool Service. During this scheme, Defendant never disclosed to S.F.C. owners that Defendant controlled these fictitious companies.

14. It was further part of the scheme and artifice to defraud that Defendant submitted to S.F.C. for reimbursement altered receipts for purchases purportedly for necessary supplies or equipment that he made from existing companies, including M.A.P. and B.I.E. Before submitting the altered receipts to S.F.C. for reimbursement, Defendant made purchases at existing companies, such as M.A.P. and B.I.E., using his Capital One credit card (account number ending in 8959), and then Defendant retained the receipts from those purchases. Defendant altered the amounts listed on those receipts by including a substantially higher dollar amount for each purchase. After inflating the dollar amounts on the receipts, Defendant submitted the fraudulent receipts to S.F.C. for reimbursement. S.F.C. then paid Defendant via check the amount that Defendant claimed to— but did not—spend on necessary supplies or equipment.

15. From at least on or about March 27, 2014, and continuing through at least on or about September 29, 2020, Defendant defrauded S.F.C. out of at least $300,000 by the means described above.

### III. Wire Transmissions

### COUNT ONE

16. Each of the allegations of Paragraphs 1 through 15 of this Indictment is hereby incorporated by reference as if fully set forth herein.

17. On or about September 14, 2016, within the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of executing the same,

**RONALD SCOTT MILLER,**

the defendant herein, did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, signals, pictures, or sounds, including an electronic message containing G.C.'s weekly timesheet information to S.F.C.'s payroll processor that an S.F.C. employee submitted from the Eastern District of Missouri through S.F.C.'s payroll processor's out of state server.

All in violation of Title 18, United States Code, Section 1343.

### COUNT TWO

18. Each of the allegations of Paragraphs 1 through 17 of this Indictment is hereby incorporated by reference as if fully set forth herein.

19. On or about May 11, 2018, within the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of executing the same,

**RONALD SCOTT MILLER,**

the defendant herein, did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, signals, pictures, or sounds, including an interstate, electronic transfer of $1,609.69 from S.F.C.'s company-owned Chase credit card (account number ending in 2170) to a Square Inc. account controlled by Defendant, which Defendant justified by submitting to S.F.C. a fraudulent invoice from a fictitious company named Mid-West Diamond.

All in violation of Title 18, United States Code, Section 1343.

### COUNT THREE

20. Each of the allegations of Paragraphs 1 through 19 of this Indictment is hereby incorporated by reference as if fully set forth herein.

21. On or about May 16, 2018, within the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of executing the same,

**RONALD SCOTT MILLER,**

the defendant herein, did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, signals, pictures, or sounds, including an interstate, electronic transfer of $1,181.12 from S.F.C.'s company-owned Chase credit card (account number ending in 2170) to a Square Inc. account controlled by Defendant, which Defendant justified by submitting to S.F.C. a fraudulent invoice from a fictitious company named Cameran Tool Service.

All in violation of Title 18, United States Code, Section 1343.

### COUNT FOUR

22. Each of the allegations of Paragraphs 1 through 21 of this Indictment is hereby incorporated by reference as if fully set forth herein.

23. On or about November 7, 2018, within the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of executing the same,

**RONALD SCOTT MILLER,**

the defendant herein, did knowingly cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, signals, pictures, or sounds, including an electronic message containing B.M.'s weekly timesheet information to S.F.C.'s payroll processor that an S.F.C. employee submitted from the Eastern District of Missouri through S.F.C.'s payroll processor's out of state server.

All in violation of Title 18, United States Code, Section 1343.

## COUNT FIVE
### (Aggravated Identity Theft: 18 U.S.C. § 1028A)

24. Each of the allegations of Paragraphs 1 through 23 of this Indictment is hereby incorporated by reference as if fully set forth herein.

25. On or about September 13, 2016, within the Eastern District of Missouri, the defendant,

**RONALD SCOTT MILLER,**

did knowingly use, without lawful authority, a means of identification of another person, to wit, the name of G.C., during and in relation to a felony violation enumerated in 18 U.S.C § 1028A(c), to wit, wire fraud, in violation of 18 U.S.C. § 1343, knowing that the means of identification belonged to another actual person, in that Defendant wrote G.C.'s name on S.F.C.'s weekly

timesheet in order to collect money from S.F.C. for work that G.C. did not perform.

All in violation of Title 18, United States Code, Section 1028A(a)(1).

## FORFEITURE ALLEGATION

The United States Attorney further alleges there is probable cause that:

1. Pursuant to Title 18, United States Code, Sections 982(a)(2), upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in Counts One – Four, the defendant shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such violation. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to such violation, which is at least $300,000.

2. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

Dated: _____                          A TRUE BILL.


                                                _____
                                                FOREPERSON

SAYLER A. FLEMING
United States Attorney


_____
Derek J. Wiseman, #67257MO
Assistant United States Attorney

10