UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:21-cr-00500-SRC |
| | ) | |
| RONALD SCOTT MILLER, | ) | |
| | ) | |
| Defendant. | ) | |

## GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

### 1. PARTIES:

The parties are the defendant Ronald Scott Miller, represented by defense counsel Richard

H. Sindel, and the United States of America (hereinafter "United States" or "Government"),

represented by the Office of the United States Attorney for the Eastern District of Missouri. This

agreement does not, and is not intended to, bind any governmental office or agency other than the

United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor

bound by this agreement.

### 2. GUILTY PLEA:

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the

defendant's voluntary plea of guilty to Count 1, the United States agrees to move for dismissal of

Counts 2 through 5 at the time of sentencing. Moreover, the United States agrees that no further

federal prosecution will be brought in this District relative to the defendant's wire fraud scheme

1

and aggravated identity theft described in the indictment, of which the Government is aware at this time.

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree that the United States will request a sentence within the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a).

## 3. ELEMENTS:

As to Count 1, the defendant admits to knowingly violating Title 18, United States Code, Section 1343, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

**One**, the defendant voluntarily and intentionally devised or participated in the scheme described in the indictment to obtain money by means of material false representations or promises;

**Two**, the defendant did so with intent to defraud; and

**Three**, the defendant caused to be used an interstate wire communication, that is an electronic message containing G.C.'s weekly timesheet information to S.F.C.'s payroll processor, in furtherance of the scheme.

2

4. **FACTS**:

The parties agree that the facts in this case are as follows and that the Government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

S.F.C. is a small business located in St. Louis County, Missouri, within the Eastern District of Missouri. S.F.C.'s business involves selling and installing floor coverings. To install floor coverings for their commercial and residential customers, S.F.C. at times employed between 35 and 45 installers during the defendant's scheme to defraud described in detail below.

Defendant Ronald Scott Miller was employed by S.F.C. as the Warehouse and Labor Supervisor. As the Warehouse and Labor Supervisor at S.F.C., Defendant's responsibilities included directly supervising S.F.C.'s installers, scheduling weekly shifts for S.F.C.'s installers, and drafting weekly timesheets for S.F.C.'s installers. Defendant also had the authority to hire flooring installers. No other employees of S.F.C. outside of management had such authority.

For each week, Defendant would draft a timesheet for S.F.C.'s installers, and Defendant would include in that weekly timesheet precisely how many hours each installer worked during each day. Defendant received an annual salary from S.F.C., and he was not authorized to receive bonus or commission payments.

As the Warehouse and Labor Supervisor at S.F.C., Defendant also had the authority to purchase any items that were necessary to complete S.F.C.'s floor covering installation projects. No other employees of S.F.C. outside of management had such authority. When Defendant purchased items that were necessary to complete S.F.C.'s floor covering installation projects, he would either pay for the items and seek reimbursement from S.F.C., or Defendant would use

3

S.F.C.'s company-owned Chase credit cards. Defendant only had authorization to use S.F.C.'s company-owned Chase credit cards to purchase items that were necessary to complete S.F.C.'s floor covering installation projects. Defendant was the only employee of S.F.C. outside of management with authorization to use S.F.C.'s company-owned Chase credit cards.

Beginning by at least on or about March 27, 2014, and continuing through at least on or about September 29, 2020, in the Eastern District of Missouri, and elsewhere, the defendant, with the intent to defraud, devised a scheme and artifice to defraud S.F.C. and to obtain money from the S.F.C. by means of material false and fraudulent pretenses, representations, and promises, as described further herein. During his scheme, Defendant defrauded S.F.C. out of $339,844.45 by the means described below.

I.    **Defendant Fraudulently Drafted and Submitted False Weekly Timesheets Reflecting Work That Employees Did Not Perform.**

It was part of the scheme and artifice to defraud that Defendant fraudulently and falsely listed on numerous weekly timesheets that Defendant, his partner (G.C.), and his son (B.M.) performed work that they did not, in fact, perform. After Defendant drafted the fraudulent weekly timesheets reflecting work that was not performed, Defendant provided those fraudulent weekly timesheets to another S.F.C. employee, who then sent the fraudulent information included in the weekly timesheets to a payroll processor via interstate wire transmission. After S.F.C.'s payroll processor received the fraudulent information that Defendant included in the weekly timesheets, the payroll processor either provided S.F.C. with physical employee paychecks, or the payroll processor facilitated direct deposits of payments into S.F.C.'s employees' bank accounts. S.F.C.

4

would not have approved the paychecks based on the fraudulent timesheets for Defendant, G.C., or B.M. but for the material misrepresentations included in those timesheets by Defendant.

**A.     Defendant Fraudulently Represented that G.C. Worked as a Flooring Installer for S.F.C. When G.C. Never Actually Worked for S.F.C.**

It was part of the scheme and artifice to defraud that Defendant fraudulently and falsely listed on weekly timesheets that his partner, G.C., worked for S.F.C. as an installer. On numerous weekly timesheets, Defendant wrote G.C.'s name, falsely indicating that G.C. worked as an installer for S.F.C., and Defendant also listed the number of hours that G.C. purportedly worked per week—all without G.C.'s knowledge or permission. In truth and fact, as Defendant knew, G.C. never worked for S.F.C. in any capacity.

It was further part of the scheme and artifice to defraud that, after S.F.C. received employee paychecks back from its payroll processor, Defendant collected G.C.'s paychecks from S.F.C.'s main office. After collecting G.C.'s paychecks, Defendant forged G.C.'s signature on the paychecks' endorsement lines, and then Defendant deposited the paychecks made out to G.C. into Defendant's personal bank account with Scott Credit Union (account number ending in 0643). Defendant took all of these actions without authorization from S.F.C. and without G.C.'s knowledge or permission.

On September 14, 2016, within the Eastern District of Missouri, for the purpose of executing the above-described scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises, Defendant knowingly caused to be transmitted an interstate wire communication, that is an electronic message containing G.C.'s false weekly timesheet information to S.F.C.'s payroll processor's out of state server.

**B.**   **Defendant Fraudulently Drafted and Submitted Weekly Timesheets Reflecting Work That B.M. Did Not Perform.**

It was further part of the scheme and artifice to defraud that Defendant falsified the nature and scope of his son's (B.M.) work at S.F.C. On numerous weekly timesheets, Defendant fraudulently and falsely inflated the hours worked by B.M., and—at times—Defendant completely fabricated the hours that B.M. worked during a pay period. For those fraudulent weekly timesheets where Defendant represented that B.M. performed work that B.M. did not perform, Defendant listed the number of hours that B.M. purportedly worked per week—all without B.M.'s knowledge or permission. In truth and fact, as Defendant knew, B.M. did not perform all of the work reflected in Defendant's fraudulent weekly timesheets. It was further part of the scheme and artifice to defraud that S.F.C.'s out-of-state payroll processor facilitated direct deposit payments based on Defendant's fraudulent weekly timesheet submissions.

**C.**   **Defendant Fraudulently Drafted and Submitted Weekly Timesheets Reflecting Work That He Did Not Perform.**

It was further part of the scheme and artifice to defraud that Defendant fraudulently and falsely listed on numerous weekly timesheets that he performed work at flooring installation projects that he did not, in fact, perform. After S.F.C.'s out-of-state payroll processor received the false information on Defendant's fraudulent timesheets via interstate wire communications, the payroll processor then facilitated direct deposit payments into Defendant's personal bank account with Scott Credit Union (account number ending in 0643).

**II.**   **Defendant Submitted Fraudulent Invoices and Altered Receipts So That S.F.C. Would Pay Him Money That He Was Not Entitled to Receive.**

6

It was further part of the scheme and artifice to defraud that Defendant submitted fraudulent invoices to S.F.C. purportedly for necessary flooring supply or repair purchases that he made from companies named Mid-West Diamond (a/k/a Mid-West Diamond Tool) and Cameran Tool Service (a/k/a Cameran Services, Cameron Services). In truth and fact, as Defendant knew, Mid-West Diamond and Cameran Tool Service were fictitious companies created by Defendant. Indeed, the addresses listed on those fraudulent invoices did not belong to any company. For both fictitious companies (Mid-West Diamond and Cameran Tool Service), Defendant created accounts with Square, Inc., both of which were linked to Defendant's personal bank account with Scott Credit Union (account number ending in 0643). After creating the Square, Inc. accounts for Mid-West Diamond and Cameran Tool Service, Defendant regularly used S.F.C.'s company-owned Chase credit cards to send payments to the Square Inc. accounts that he created for Mid-West Diamond and Cameran Tool Service. To justify the payments from S.F.C.'s company-owned Chase credit cards to the Square Inc. accounts for Defendant's fictitious companies, Defendant would submit fraudulent invoices purportedly from the companies. In addition to using S.F.C.'s company-owned Chase credit cards to send payments to his fictitious companies' Square Inc. accounts, Defendant also sought reimbursements from S.F.C. for purchases that he purportedly made from Mid-West Diamond and Cameran Tool Service. In response to Defendant's requests for reimbursement, S.F.C. would write Defendant checks for the amounts that Defendant purportedly paid to Mid-West Diamond and Cameran Tool Service. During this scheme, Defendant never disclosed to S.F.C. owners that Defendant controlled these fictitious companies.

It was further part of the scheme and artifice to defraud that Defendant submitted to S.F.C. for reimbursement altered receipts for purchases purportedly for necessary supplies or equipment

7

that he made from existing companies, including M.A.P. and B.I.E. Before submitting the altered receipts to S.F.C. for reimbursement, Defendant made purchases at existing companies, such as M.A.P. and B.I.E., using his Capital One credit card (account number ending in 8959), and then Defendant retained the receipts from those purchases. Defendant altered the amounts listed on those receipts by including a substantially higher dollar amount for each purchase. After inflating the dollar amounts on the receipts, Defendant submitted the fraudulent receipts to S.F.C. for reimbursement. S.F.C. then paid Defendant via check the amount that Defendant claimed to—but did not—spend on necessary supplies or equipment. S.F.C. would not have reimbursed Defendant for the fraudulent invoices and altered receipts submitted by Defendant but for the material misrepresentations included in those documents by Defendant.

**5. STATUTORY PENALTIES:**

The defendant fully understands that the maximum possible penalty provided by law for the crime to which the defendant is pleading guilty is imprisonment of not more than 20 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

**6. U.S. SENTENCING GUIDELINES: 2018 MANUAL:**

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the applicable U.S. Sentencing Guidelines Total Offense Level provisions.

8

**a.  Chapter 2 Offense Conduct:**

**(1)  Base Offense Level:**  As to Count 1, the parties agree that the base offense level is 7, as found in Section 2B1.1(a)(1).

**(2)  Specific Offense Characteristics:**  The parties agree that the following Specific Offense Characteristics apply as to Count 1:

The parties agree that 12 levels should be added under Section 2B1.1(b)(1)(G) because the loss exceeds $250,000, but does not exceed $550,000. By executing the scheme to defraud as described above, the defendant defrauded S.F.C. out of $339,844.45.

The parties agree that 2 levels should be added under Section 2B1.1(b)(10)(C) because the offense involved sophisticated means and the defendant intentionally engaged in the conduct constituting sophisticated means.

**b.  Chapter 3 Adjustments:**

**(1)  Acceptance of Responsibility:** The parties agree that three levels should be deducted pursuant to Section 3E1.1(a) and (b), because the defendant has clearly demonstrated acceptance of responsibility. The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the Government receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the Government may present said evidence to the court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

**(2)  Other Adjustments:** The parties agree that 2 levels should be added under Section 3B1.3 because the defendant abused a position of private trust. The parties have no further agreement regarding any other adjustments.

**c.  Estimated Total Offense Level:**  The parties estimate that the Total Offense Level is 20.

**d.  Criminal History:**  The determination of the defendant's Criminal History Category shall be left to the Court.  Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category.  The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**e.  Effect of Parties' U.S. Sentencing Guidelines Analysis:**  The parties agree that the Court is not bound by the Guidelines analysis agreed to herein.  The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement. The Government recognizes it is bound by the specific agreements made above but reserves the right to answer any questions the U.S. Probation Office or the Court might have related to sentencing or present evidence at the Court's request.

## 7.  WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:

**a.  Appeal:**  The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

10

(1) **Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery, the guilty plea, the constitutionality of the statute(s) to which defendant is pleading guilty and whether defendant's conduct falls within the scope of the statute(s).

(2) **Sentencing Issues:** In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, and, after determining the applicable Sentencing Guidelines range, sentences the defendant within or below that range, then, as part of this agreement, the defendant hereby waives all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea, the agreed Total Offense Level and sentences the defendant within or above that range.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

11

**8. OTHER:**

    **a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the Government.

    **b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

    **c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished.

    **d. Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $100, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

12

e. **Possibility of Detention**: The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

f. **Fines, Restitution and Costs of Incarceration and Supervision**: The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision. The defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately. Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c). Regardless of the Count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss. The defendant agrees to provide full restitution in the amount of $339,844.45 to all victims of all charges in the indictment.

## 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the defendant acknowledges, fully understands and hereby waives ~~her~~ *his* rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the Government to prove the elements of the offenses against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

13

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the Government's evidence and discussed the Government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the Government's case and any defenses.

The guilty plea could impact defendant's immigration status or result in deportation. In particular, if any crime to which defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

## 10. **VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:**

This document constitutes the entire agreement between the defendant and the Government, and no other promises or inducements have been made, directly or indirectly, by any agent of the Government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly,

14

threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT:

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the Government agrees to dismiss or not to bring.

9/2/2022
_____
Date

_____
DEREK J. WISEMAN
Assistant United States Attorney

8/30/22
_____
Date

9/1/22
_____
Date

_____
RONALD SCOTT MILLER
Defendant

_____
RICHARD H. SINDEL
Attorney for Defendant

16